Slip Op. 13 - 96

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| BAROQUE TIMBER INDUSTRIES (ZHONGSHAN) COMPANY, LIMITED, *et al.*,<br><br>          Plaintiffs,<br><br>               v.<br><br>UNITED STATES,<br><br>          Defendant,<br><br>               and<br><br>COALITION FOR AMERICAN HARDWOOD PARITY, *et al.*,<br><br>          Defendant-Intervenors. | Before: Donald C. Pogue,<br>          Chief Judge<br><br>Consol. Court No. 12-00007[1] |

**OPINION**

[final determination of sales at less than fair value affirmed
in part and remanded in part]

Dated: July 31, 2013

          Francis J. Sailer, Mark E. Pardo, Andrew T. Schutz,
and John M. Foote, Grunfeld, Desiderio, Lebowitz, Silverman &
Klestadt LLP, of Washington, DC, for Baroque Timber Industries

---

[1] This action was consolidated with court nos. 11-00452, 12-
00013, and 12-00020. Order, May 31, 2012, ECF No. 37.  The
complaint filed by the Coalition for American Hardwood Parity in
court no. 11-00452 was heard and decided separately in Baroque
Timber Industries (Zhongshan) Co. v. United States, __ CIT __,
853 F. Supp. 2d 1290 (2012), and Baroque Timber Industries
(Zhongshan) Co. v. United States, __ CIT __, 865 F. Supp. 2d
1300 (2012).  The Coalition's complaint was ultimately
dismissed. Baroque Timber Indus., 865 F. Supp. 2d at 1311.

(Zhongshan) Co., Ltd.; Riverside Plywood Corp.; Samling Elegant
Living Trading (Labuan) Ltd.; Samling Global USA, Inc.; Samling
Riverside Co., Ltd.; and Suzhou Times Flooring Co., Ltd.

        Gregory S. Menegaz, James K. Horgan, and John J.
Kenkel, deKieffer & Horgan, PLLC, Washington, DC, for Zhejiang
Layo Wood Industry Co., Ltd.; Changzhou Hawd Flooring Co., Ltd.;
Dunhua City Jisen Wood Industry Co., Ltd.; Dunhua City Dexin
Wood Industry Co., Ltd.; Dalian Huilong Wooden Products Co.,
Ltd.; Kunshan Yingyi-Nature Wood Industry Co., Ltd.; and Karly
Wood Product Ltd.

        Kristin H. Mowry, Jeffrey S. Grimson, Jill A. Cramer,
Susan L. Brooks, Sarah M. Wyss, and Rebecca M. Janz, Mowry &
Grimson, PLLC, of Washington, DC, for Fine Furniture (Shanghai)
Ltd.; Great Wood (Tonghua) Ltd.; and Fine Furniture Plantation
(Shishou) Ltd.

        Kristen S. Smith and Mark R. Ludwikowski, Sandler,
Travis & Rosenberg, PA, of Washington, DC, for Lumber
Liquidators Services, LLC; Armstrong Wood Products (Kunshan)
Co., Ltd.; and Home Legend, LLC.

        Jeffrey S. Neeley, Michael S. Holton, and Stephen W.
Brophy, Barnes, Richardson & Colburn, Washington, DC, for
Zhejiang Yuhua Timber Co., Ltd.

        Alexander V. Sverdlov, Trial Attorney, Commercial
Litigation Branch, Civil Division, United States Department of
Justice, of Washington, DC, for the United States.  With him on
the brief were Stuart F. Delery, Principal Deputy Assistant
Attorney General, Jeanne E. Davidson, Director, and Claudia
Burke, Assistant Director.  Of counsel on the brief was Shana
Hofstetter, Attorney, International Office of the Chief Counsel
for Import Administration, U.S. Department of Commerce, of
Washington, DC.

        Jeffrey S. Levin, Levin Trade Law, P.C., of Bethesda,
MD, for the Coalition for American Hardwood Parity.

        **Pogue, Chief Judge:**  This is a consolidated action

seeking review of determinations made by the Department of

Commerce ("Commerce") in the antidumping duty investigation of

multilayered wood flooring from the People's Republic of China

("China").[2]  Currently before the court is Respondents' Motion for Judgment on the Agency Record.  Respondents[3] challenge nine aspects of Commerce's <u>Final Determination</u> including: (1) Commerce's decision to apply its targeted dumping method on the basis of non-dumped sales; (2) Commerce's withdrawal of the targeted dumping regulations; (3) Commerce's use of zeroing in an investigation; (4) the surrogate value of Layo's core veneer used for plywood production; (5) the surrogate value of Layo's high density fiberboard ("HDF") input; (6) the surrogate value of Samling's HDF input; (7) the surrogate value of Layo's plywood inputs; (8) the surrogate value of brokerage and handling fees; and (9) Commerce's rejection of certain surrogate financial statements.

---

[2] <u>Multilayered Wood Flooring from the People's Republic of China</u>, 76 Fed. Reg. 64,318 (Dep't Commerce Oct. 18, 2011) (final determination of sales at less than fair value) ("<u>Final Determination</u>") and accompanying Issues & Decision Memorandum, A-570-970, POI Apr. 1, 2010 – Sept. 30, 2010 (Oct. 11, 2011) ("<u>I & D Mem.</u>").

[3] The Respondents who are party to this case include Baroque Timber Industries (Zhongshan) Co., Ltd., Riverside Plywood Corp., Samling Elegant Living Trading (Labuan) Ltd., Samling Global USA, Inc., Samling Riverside Co., Ltd., Suzhou Times Flooring Co., Ltd., Zhejiang Layo Wood Industry Co., Ltd., Changzhou Hawd Flooring Co., Ltd., Dunhua City Jisen Wood Industry Co., Ltd., Dunhua City Dexin Wood Industry Co., Ltd., Dalian Huilong Wooden Products Co., Ltd., Kunshan Yingyi-Nature Wood Industry Co., Ltd., Karly Wood Product Ltd., and Fine Furniture (Shanghai) Ltd. Resp'ts' Mem. L Supp. Mot. J. Agency R., ECF No. 63 ("Resp'ts' Br.") at 1 n.1.

In response, Commerce requests voluntary remand to reconsider the valuation of Layo's plywood input and Samling's HDF input.  Commerce also requests voluntary remand to reconsider the application of its method for analyzing targeted dumping in light of any changes in value that may result from reconsideration of the two surrogate values for which remand is requested and in light of its current standards for applying its targeted dumping method.  Commerce contests the remaining challenges to the <u>Final Determination</u>.

The court has jurisdiction pursuant to § 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2006)[4] and 28 U.S.C. § 1581(c) (2006).

As explained below, the <u>Final Determination</u> is affirmed in part and remanded in part: (1) Commerce's request for remand to reconsider the surrogate value determinations for Layo's plywood input and Samling's HDF input is granted; (2) Commerce's targeted dumping determination is remanded for reconsideration in light of any changes to the surrogate value determinations and in light of Commerce's current standards;

---

[4] All further citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, 2006 edition, unless otherwise noted.

(3) the surrogate value determinations for Layo's core veneer,

Layo's HDF input, and the brokerage and handling fees are

remanded for further explanation or reconsideration consistent

with this opinion; and (4) Commerce's rejection of Respondents'

late filed surrogate financial statements is affirmed.

## BACKGROUND[5]

Responding to a petition by the Coalition for American

Hardwood Parity ("CAHP" or "Petitioners"), Commerce initiated an

antidumping duty investigation of multilayered wood flooring

from China on November 18, 2010. Multilayered Wood Flooring from

the People's Republic of China, 75 Fed. Reg. 70,714 (Dep't

Commerce Nov. 18, 2010) (initiation of antidumping duty

investigation).  As permitted by the statute, Commerce chose

three mandatory respondents for the investigation: Zhejiang

Yuhua Timber Co., Ltd. ("Yuhua"), Zhejiang Layo Wood Industry

Co., Ltd. ("Layo"), and the Samling Group[6] ("Samling").

Multilayered Wood Flooring from the People's Republic of China,

---

[5] This is background relevant to all the issues presented;
facts relevant only to particular issues are found in the
discussion section.

[6] The Samling Group includes Baroque Timber Industries
(Zhongshan) Co., Ltd., Riverside Plywood Corp., Samling Elegant
Living Trading (Labuan) Ltd., Samling Global USA, Inc., Samling
Riverside Co., Ltd., and Suzhou Times Flooring Co., Ltd.
Resp'ts' Br. at 1 n.1.

76 Fed. Reg. 30,656, 30,658 (Dep't Commerce May 26, 2011)

(preliminary determination of sales at less than fair value)

("Preliminary Determination"); see also 19 U.S.C.

§ 1677f-1(c)(2)(B).  Commerce published its Final Determination

on October 18, 2011, finding that the subject merchandise was

being sold at less than fair value in the United States, i.e.,

dumped. Final Determination, 76 Fed. Reg. at 64,323-24.

Commerce determined that a de minimis dumping margin existed for

Yuhua, but assigned margins of 3.98% and 2.63% to Layo and

Samling respectively. Id.


                        **STANDARD OF REVIEW**

        When reviewing Commerce's decisions made in

antidumping investigations, the court "shall hold unlawful any

determination, finding, or conclusion found . . . to be

unsupported by substantial evidence on the record, or otherwise

not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).


                            **DISCUSSION**

I.   Voluntary Remand

        Commerce requests voluntary remand to reconsider two

determinations that it may have made in error: (1) the surrogate

value[7] of Layo's plywood input and (2) the surrogate value of

Samling's HDF input. Def.'s Resp. to Pls.' Consol. Mot. J.

Admin. R., ECF No. 76 ("Def.'s Resp. Br.") at 28-29.  Commerce

also requests remand to reconsider the application of its method

for analyzing targeted dumping in light of any changes to these

two surrogate values and in light of its current standards.

Def.'s Resp. Br. at 29; Def.'s Supplemental Br., ECF No. 116, at

16-18.

        While a reviewing court will refuse a request for

voluntary remand that is frivolous or in bad faith, "if the

agency's concern is substantial and legitimate, a remand is

_____

        [7] Commerce has designated China a non-market economy
country ("NME").  NME data for measuring normal value is
presumed to be unreliable due to the absence of market forces in
the country; therefore, Commerce calculates normal value for
merchandise from an NME using surrogate values for factors of
production drawn from a market economy country. 19 U.S.C.
§ 1677b(c)(1); see also Shanghai Foreign Trade Enters. Co. v.
United States, 28 CIT 480, 481, 318 F. Supp. 2d 1339, 1341
(2004).  Surrogate values must be based on the best available
information, § 1677b(c)(1), drawn from "one or more market
economy countries that are (A) at a level of economic
development comparable to that of the nonmarket economy country,
and (B) significant producers of comparable merchandise,"
§ 1677b(c)(4).  The statute does not define best available
information, but it is Commerce's policy to "choose a surrogate
value that represents country-wide price averages specific to
the input, which are contemporaneous with the [POI], net of
taxes and import duties, and based on publicly available, non-
aberrational, data from a single surrogate [market economy]
country." I & D Mem., cmt. 13 at 59.

usually appropriate." SKF USA Inc. v. United States, 254 F.3d

1022, 1029 (Fed. Cir. 2001).  Commerce's concerns are considered

substantial and legitimate when (1) Commerce supports its

request with a compelling justification, (2) the need for

finality does not outweigh the justification, and (3) the scope

of the request is appropriate. Ad Hoc Shrimp Trade Action Comm.

v. United States, __ CIT __, 882 F. Supp. 2d 1377, 1381 (2013).

This three-pronged test will be applied to each of Commerce's

requests in turn.

   A.  *Layo's Plywood Input*

        The agency justifies its first remand request on the

basis that, "Commerce has discovered that there is conflicting

evidence on the record as to the range of Layo Wood's plywood

thicknesses." Def.'s Resp. Br. at 28.  Clarifying and correcting

a potentially inaccurate determination is a compelling

justification. See Parkdale Int'l v. United States, 475 F.3d

1375, 1380 (Fed. Cir. 2007) ("[A]n overriding purpose of

Commerce's administration of antidumping laws is to calculate

dumping margins as accurately as possible . . . .").  In the

context of a routine appeal of a final determination, the need

to accurately calculate margins is not outweighed by the

interest in finality. See Shakeproof Assembly Components Div. of

Ill. Tool Works, Inc. v. United States, 29 CIT 1516, 1523-24,

412 F. Supp. 2d 1330, 1337-38 (2005).  In addition, the scope of

Commerce's remand request — to clarify the record evidence and
revise the determination if warranted — is an appropriate
response to Commerce's concern.   Therefore, Commerce's request
for remand to reconsider the surrogate value determination for
Layo's plywood input is granted.[8]

      B.   *Samling's HDF Input*

      Commerce also requests remand to reconsider the
surrogate value determination for Samling's HDF input because
the Harmonized Tariff Schedule ("HTS") category used to value
Samling's HDF input may not accurately represent Samling's HDF
input. Def.'s Resp. Br. at 29.   The voluntary remand analysis
above also applies to this determination and supports granting
Commerce's request.   As noted above, accuracy is a compelling

---

[8] The court will not, as Layo suggests, require Commerce to
adopt Layo's recommended procedures and calculations for valuing
the plywood input. Resp'ts' Reply Br., ECF No. 87, at 21.   In
matters of method, the court "defer[s] to the agency whose
expertise, after all, consists of administering the statute."
Gleason Indus. Prods., Inc. v. United States, 31 CIT 393, 396
(2007); cf. NLRB v. Enter. Ass'n of Steam, Hot Water, Hydraulic
Sprinkler, Pneumatic Tube, Ice Mach. & Gen. Pipefitters, Local
Union No. 638, 429 U.S. 507, 522 n.9 (1977) ("When an
administrative agency has made an error of law, the duty of the
Court is to correct the error of law committed by that body, and
after doing so to remand the case to the [agency] so as to
afford it the opportunity of examining the evidence and finding
the facts as required by law.") (alteration in original)
(citation omitted) (internal quotation marks omitted).

justification, which is not outweighed by finality in this case,

and the scope of the remand request is appropriate.

CAHP objects to remand of this determination on the

grounds that Samling failed to exhaust its administrative

remedies.[9] Def.-Intervenor's Resp. to Pls.' Consol. Mot. J.

Admin. R., ECF No. 82 ("Def.-Intervenor's Resp. Br.") at 6-9.

But refusing Commerce's remand request on exhaustion grounds is

not appropriate on the facts of this case.  During verification,

Layo submitted additional information to Commerce regarding the

proper HTS category for the HDF input. Layo Case Br., A-570-970,

POI Apr. 1, 2010 – Sept. 30, 2010 (Aug. 5, 2011), Admin. R. Pt.

---

[9] When reviewing challenges to antidumping determinations,
this court "shall, where appropriate, require the exhaustion of
administrative remedies." 28 U.S.C. § 2637(d) (2006).  Requiring
parties to exhaust their administrative remedies "allows the
agency to apply its expertise, rectify administrative mistakes,
and compile a record adequate for judicial review — advancing
the twin purposes of protecting administrative agency authority
and promoting judicial efficiency." Camau Frozen Seafood
Processing Imp. Exp. Corp. v. United States, __ CIT __,
880 F. Supp. 2d 1348, 1355 (2012) (quoting Carpenter Tech. Corp.
v. United States, 30 CIT 1595, 1597, 464 F. Supp. 2d 1347, 1349
(2006)).  While the "general rule [is] that courts should not
topple over administrative decisions unless the administrative
body not only has erred but has erred against objections made at
the time appropriate under its practice," Dorbest Ltd. v. United
States, 604 F.3d 1363, 1375 (Fed. Cir. 2010) (quoting United
States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 37
(1952)), the statute permits the court discretion to decide when
requiring exhaustion is appropriate, see Camau Frozen Seafood,
__ CIT at __, 880 F. Supp. 2d at 1356.

2 Pub. Doc. 2, at 25-26.  In light of Layo's submission,
Commerce altered the HTS category used to value Layo's HDF
input.  I & D Mem., cmt. 20 at 81-82.  Although HDF is an input
common to Layo and Samling, Commerce did not seek similar
information from Samling or change the HTS category used to
value Samling's HDF input.  See Id.  Thus, the issue was before
Commerce, but Commerce declined to address it with regard to
Samling.  Cf. Calgon Carbon Corp. v. United States, Slip Op. 11-
21, 2011 WL 637605, at *6 (CIT Feb. 17, 2011) ("Commerce had no
obligation to accept additional evidence at verification.  Once
Commerce did accept such evidence, however, Commerce had an
obligation to treat [plaintiff] fairly by giving it a similar
opportunity.").  Moreover, because Commerce has requested
voluntary remand there is little concern that the alleged
failure to exhaust will "deprive[] the agency of the opportunity
to consider these arguments in the first instance." Carpenter
Tech., 30 CIT at 1598, 464 F. Supp. 2d at 1349.  Rather, remand
will "allow[] the agency to apply its expertise, rectify
administrative mistakes, and compile a record adequate for
judicial review . . . ." Id.

         Therefore, Commerce's request for remand to reconsider
the proper HTS category for valuing Samling's HDF input is
granted.

    *C.   Targeted Dumping*

        Third, Commerce requests remand to reconsider the
application of its targeted dumping method in light of "any
changes in surrogate values [for Layo's plywood input and
Samling's HDF input] and in accordance with its current
standards." Def.'s Resp. Br. at 29.  Commerce contends that
changes in surrogate values and application of updated standards
for applying the targeted dumping method may result, on remand,
in a determination that the targeted dumping method should not
be applied to either Samling or Layo; therefore, Plaintiffs'
targeted dumping challenges may become moot. Def.'s Supplemental
Br. at 10–18.  The Government's Response Brief did not clearly
explain the basis for seeking remand to reconsider the
application of the targeted dumping method; however, in
supplemental briefing filed with leave of the court, the
Government presented a persuasive argument explaining why the
targeted dumping issues may become moot on remand.[10]

---

    [10] The court does not reach the merits of Plaintiffs'
targeted dumping challenges; however, it does note the recent
decision in Gold East Paper (Jiangsu) Co. v. United States, Slip
Op. 13-74, 2013 WL 2996231 (CIT June 17, 2013).  Gold East Paper
decided a challenge to the withdrawal of the targeted dumping
regulations similar to that raised by the Plaintiffs in this
case, holding that the regulations were improperly withdrawn.
Id. at *5-8.  While the issue is not decided here, considered in
light of Gold East Paper, the Government's defense of the
withdrawal does not appear strong.  Specifically, it does not

To explain:  Commerce is permitted by statute to use

an average-to-transaction method, referred to as the targeted

dumping method,[11] to calculate the dumping margin if "(i) there

_____

appear persuasive to respond to the Administrative Procedure
Act's notice and comment requirement by providing an opportunity
to comment in a general way on the application of the targeted
dumping methodology.  The government presents no reason to
believe that this general notice, on a different subject, should
be considered adequate notice of an outright withdrawal of the
subject regulations.  Nor are the cases the Government cites to
support this method of rulemaking apposite.  The withdrawal of
the targeted dumping regulations was neither a "logical
outgrowth" of the prior opportunities to comment, cf. Ariz. Pub.
Serv. Co. v. EPA, 211 F.3d 1280, 1299-1300 (D.C. Cir. 2000)
(denying notice and comment challenge where "the final rule was
not wholly unrelated or surprisingly distant from what the
[agency] initially suggested"), nor was the withdrawal simply an
alteration of a previously proposed rule, see First Am. Discount
Corp. v. Commodity Futures Trading Comm'n, 222 F.3d 1008, 1015
(D.C. Cir. 2000); cf. Fed. Express Corp. v. Mineta, 373 F.3d
112, 120 (D.C. Cir. 2004) ("Although perhaps [the agency] should
not have labeled the First through Third rules as 'final,' the
agency has made a compelling showing that it provided a
meaningful opportunity to comment before the Fourth Final Rule
became effective.") (citations omitted) (internal quotation
marks omitted).  Finally, because Commerce had ample opportunity
to provide notice and comment, it does not appear appropriate to
claim that this was an "emergency situation[], or [a situation]
where delay would result in serious harm," Jifry v. FAA, 370
F.3d 1174, 1179 (D.C. Cir. 2004) (citation omitted), such as
would warrant application of the good cause exception.

[11] Commerce determines whether merchandise is sold at less
than fair value, i.e. dumped, by comparing export price to
normal value. 19 U.S.C. § 1677(34), (35)(A) (defining dumping
and dumping margin).  The statute provides two default methods
for making the less than fair value determination in an
investigation. § 1677f-1(d)(1)(A).  Commerce may compare either
(1) the weighted average normal value to the weighted average
export price for sales of comparable merchandise, the "average-
to-average" or "A-A" method, § 1677f-1(d)(1)(A)(i), or (2) the

                                        (footnote continued)

is a pattern of export prices (or constructed export prices) for

comparable merchandise that differ significantly among

purchasers, regions, or periods of time, and (ii) [Commerce]

explains why such differences cannot be taken into account using

a method described in paragraph (1)(A)(i) [the commonly employed

average-to-average method] or (ii) [the transaction-to-

transaction method]." § 1677f-1(d)(1)(B).

        To satisfy the first element of the statutory test, "a

pattern of export prices . . . that differ significantly among

purchasers, regions, or periods of time," § 1677f-1(d)(1)(B)(i),

Commerce relies on a test first introduced in the antidumping

investigation of Certain Steel Nails from the People's Republic

of China (the "Nails from China Test").[12] I & D Mem., cmt. 4

---

normal values of individual transactions to the export prices of
individual transactions, the "transaction-to-transaction" or "T-
T" method, § 1677f-1(d)(1)(A)(ii).  If, however, Commerce makes
the necessary findings pursuant to § 1677f-1(d)(1)(B), discussed
below, then it may compare the weighted average of the normal
values to the export prices of individual transactions, the
"average-to-transaction" or "A-T" method. § 1677f-1(d)(1)(B).

    [12] Certain Steel Nails from the People's Republic of China,
73 Fed. Reg. 33,977 (Dep't Commerce June 16, 2008) (final
determination of sales at less than fair value and partial
affirmative determination of critical circumstances) and
accompanying Issues & Decision Memorandum, A-570-909, POI Oct.
1, 2006 – Mar. 31, 2007 (June 6, 2008) cmts. 3-7 at 15-23.
    The Nails from China Test has two steps.  In step one,
Commerce "determines the share of the alleged targeted-
customer's purchases of subject merchandise (by sales volume)
that are at prices more than one standard deviation below the

                                    (footnote continued)

at 29-31.  When Commerce applied the Nails from China Test in
this case, the test did not take into account what proportion of
a respondent's total sales volume consisted of targeted sales.
Def.'s Supplemental Br. at 17.  Commerce has altered its
practice since publication of the Final Determination and now
examines a respondent's targeted dumping by volume as a
component of the pattern requirement. Id. at 16-17; Certain
Stilbenic Optical Brightening Agents from Taiwan, 76 Fed. Reg.
68,154, 68,156 (Dep't Commerce Nov. 3, 2011) (preliminary
determination of sales at less than fair value and postponement
of final determination), unchanged in Certain Stilbenic Optical
Brightening Agents from Taiwan, 77 Fed. Reg. 17,027 (Dep't
Commerce Mar. 22, 2012) (final determination of sales at less
than fair value).

---

weighted-average price to all customers, targeted and non-
targeted," and if such share of sales exceeds thirty-three
percent of the total volume of a respondent's sales of subject
merchandise to the alleged targeted customer, then Commerce
considers there to be a pattern of price differences. I & D
Mem., cmt. 4 at 30.  In the second step, Commerce examines all
sales of identical merchandise by a respondent to the alleged
targeted customer and "determines the total volume of sales for
which the difference between the weighted-average price of sales
to the allegedly targeted customer and the next higher weighted-
average price of sales to a non-targeted customer exceeds the
average price gap (weighted by sales volume) for the non-
targeted group," and if such share of sales exceeds five
percent, Commerce considers there to be a significant difference
in prices. Id. at 30-31.

Plaintiffs have argued that their proportion of
targeted sales by volume is minimal.  Particularly, Plaintiffs
contend that only 2.66% of Layo's sales were found to be
targeted and only 7.40% of Samling's sales were found to be
targeted. Resp'ts' Br. at 18; see also Def.'s Supplemental Br.
at 18.  In light of the changes to the Nails from China Test and
the argument put forward by Plaintiffs, Commerce, on remand, may
find that there was not a pattern of significant price
differences pursuant to 19 U.S.C. § 1677f-1(d)(1)(B)(i).[13]

_____

[13] Petitioner's argue that permitting Commerce to apply its
modified Nails from China Test on remand would be fundamentally
unfair and possibly improper retroactive action. Def.-
Intervenor's Resp. to Def.'s Supplemental Br., ECF No. 119
at 5-9.  Commerce's request, however, falls squarely within the
parameters for remand articulated in SKF USA:

> [T]he agency may request a remand because it believes
> that its original decision is incorrect on the merits
> and wishes to change the result. . . . The more
> complex question, however, involves a voluntary remand
> request associated with a change in agency policy or
> interpretation. . . . Where there is no step one
> Chevron issue, we believe a remand to the agency is
> required, absent the most unusual circumstances
> verging on bad faith.  Under Chevron, agencies are
> entitled to formulate policy and make rules "to fill
> any gap left, implicitly or explicitly, by Congress."
> Furthermore, an agency must be allowed to assess "the
> wisdom of its policy on a continuing basis."  Under
> the Chevron regime, agency discretion to reconsider
> policies does not end once the agency action is
> appealed.

SKF USA, 254 F.3d at 1029-30 (quoting Chevron U.S.A. Inc. v.
Natural Resources Def. Council, 467 U.S. 837, 843, 864 (1983)).

To satisfy the second part of the statutory test, i.e., to show that the differences cannot be taken into account using the A-A method, § 1677f-1(d)(1)(B)(ii), Commerce calculates the dumping margin using both the A-A method and the A-T method. See, e.g., Bottom Mount Combination Refrigerator-Freezers from Mexico, 77 Fed. Reg. 17,422, 17,424 (Dep't Commerce Mar. 26, 2012) (notice of final determination of sales at less than fair value and affirmative critical circumstances determination).  If the A-A and A-T methods yield insignificantly different margins, then Commerce considers any price differences found pursuant to the Nails from China Test to be taken into account by the A-A method and does not apply the targeted dumping method. Id.  Because the dumping margin is affected by changes in surrogate value, the request for remand of certain surrogate values, discussed above, and the court's remand of other surrogate values, discussed below, may alter the relative margins produced by the A-A and A-T methods.  In particular, Samling argues, and Commerce acknowledges, that changing the HTS category used to value Samling's HDF input – which Commerce has requested remand to reconsider – is likely to result in a de minimis margin for Samling using either the A-A or A-T method. Resp'ts' Br. at 64; Def.'s Supplemental Br. at 14.  Thus, because the court is remanding surrogate value determinations for reconsideration, Commerce may, on remand,

determine that part two of the statutory test is unsatisfied for one or both Plaintiffs.

It follows that Commerce has presented a persuasive argument that reconsideration upon remand may result in both Plaintiffs failing to meet the statutory test for application of the targeted dumping method.  If, on remand, Commerce does not apply the targeted dumping method to any Plaintiff, then the targeted dumping arguments raised by Plaintiffs will become moot.  The possibility that the targeted dumping method will not be applicable to Plaintiffs upon remand is a compelling justification for remand, and the possibility that any decision this court would make on the merits regarding the targeted dumping challenges will become moot diminishes concerns of finality. See Ad Hoc Shrimp Trade Action Comm., __ CIT at __, 882 F. Supp. 2d at 1381.  For this reason, the court grants Commerce's request for voluntary remand to reconsider application of the targeted dumping method in light of changes to surrogate values and in conformity with current standards.[14]

_____

[14] In light of the possibility that Plaintiffs' substantive challenges to the method for analyzing targeted dumping will become moot on remand, it is also possible that Commerce will not use zeroing in this investigation, thus rendering moot Plaintiffs' challenge to the use of this practice in investigations.  Accordingly, any consideration of zeroing will also be deferred.

## II.   Other Surrogate Values

### A.   *Surrogate Value of Layo's Core Veneer*

Commerce defined MLWF for purposes of the investigation as wood flooring that is "composed of an assembly of two or more layers or plies of wood veneer(s) in combination with a core.  The several layers, along with the core, are glued or otherwise bonded together to form a final assembled product." Preliminary Determination, 76 Fed. Reg. at 30,657 (footnote omitted).  Layo produces multilayered wood flooring composed of a face veneer, core layer, and back layer. Layo Sales & FOP Verification Report, A-570-970, POI Apr. 1, 2010 – Sept. 30, 2010 (July 22, 2011), Admin. R. Pt. 1 Pub. Doc. 599 ("Layo Verification Report") at 13.  Layo uses core grade wood sheets and chips, or core veneer,[15] to produce plywood for the core layer of its wood flooring. Layo Section C & D Questionnaire, A-570-970, POI Apr. 1, 2010 – Sept. 30, 2010 (Feb. 23, 2011),

---

[15] The parties refer to the core-grade wood sheets and chips used to produce the core layer in a variety of ways, including core veneer, core chips and sheets, and core material. Consistent with the Issues and Decision Memorandum in this case, the court will refer to the materials used to produce the core layer as core veneer.  The core veneer, used to produce the core layer, is distinct from face veneer, the top-most or exterior layer of finished MLWF. I & D Mem., cmts. 14–16 at 66–74 (discussing different surrogate values for face veneers and core veneers).

Admin. R. Pt. 1 Pub. Doc. 321 ("Layo C & D Questionnaire")
at 10-11.

In the <u>Preliminary Determination</u>, Commerce valued
Layo's core veneer using Philippine National Statistics Office
("NSO") data, specifically values for Philippine HTS subheading
4408.90.10, which applies to non-coniferous, non-tropical
("NCNT") face veneer. <u>I & D Mem.</u>, cmt. 16 at 73; Preliminary
Surrogate Value Mem., A-570-970, POI Apr. 1, 2010 – Sept. 30,
2010 (May 19, 2011), Admin. R. Pt. 1 Pub. Doc. 523, at 7.  In
comments on the <u>Preliminary Determination</u>, both Layo and
Petitioners agreed that Layo's core veneers are properly
classified under Philippine HTS subheading 4408.90.90-06, which
is the HTS subheading for "sheets for plywood." <u>I & D Mem.</u>, cmt.
16 at 73.  The parties did not, however, agree on a dataset that
would provide a basis for valuing core veneer using the ten
digit subheading, HTS 4408.90.90-06.  Petitioners argued that
the only data available for HTS 4408.90.90-06 reflected a low
volume of imports from a single country during 2009, a non-
contemporaneous period; therefore, Petitioners argued, Commerce
should value core veneer using the eight digit basket subheading
HTS 4408.90.90, which includes the ten digit subheading HTS

4408.90.90-06 along with other ten digit subheadings.[16] Id.  In

response, Layo argued that the NSO data did not provide values

for the specific subheading at issue and Commerce should value

core veneer on the basis of HTS 4408.90.90-06 drawn from Global

Trade Atlas ("GTA") data. Id.  Commerce agreed with Petitioners

and valued Layo's core veneer using the basket category, HTS

4408.90.90, drawn from the NSO data. Id.  Layo challenges this

determination on the grounds that HTS 4408.90.90 was not the

best available information because it lacked specificity and was

unreasonable because it resulted in a value for core veneer that

exceeded the value for face veneer. Resp'ts' Br. at 52–57.

---

[16] The breakdown of the basket subheading HTS 4408.90.90 is
as follows:

```
4408.90.90: Other
       4408.90.90-01: A. Sheets for veneering which are
                         obtained by slicing laminated wood
       4408.90.90     B. Other
       4408.90.90-02: Sheets for plywood, of White Lauan
       4408.90.90-03: White Lauan, sawn lengthwise, sliced or
                         peeled
       4408.90.90-04: Tanguile, sawn lengthwise, sliced or
                         peeled
       4408.90.90-05: Veneer corestock
       4408.90.90-06: Sheets for plywood
       4408.90.90-07: Narra, sawn lengthwise, sliced or
                         peeled
       4408.90.90-09: Other
```

Philippine Standard Commodity Classification, Ex. 2 to Pet'rs'
Factor Data, A-570-970, POI Apr. 1, 2010 – Sept. 30, 2010 (July
5, 2011), Admin. R. Pt. 1 Pub. Doc. 581 (asterisks omitted).

When considering Layo's challenges, the court will not substitute its judgment regarding what evidence constitutes the best available information for that of Commerce, so long as Commerce's determination is reasonable. See Zhejiang DunAn Hetian Metal Co. v. United States, 652 F.3d 1333, 1341 (Fed. Cir. 2011).  There are two aspects of Commerce's determination, however, that, absent further explanation, make it unreasonable.

First, the NSO data does not reflect any imports specific to the input at issue.  The 2010 NSO data contains no record of imports under HTS 4408.90.90-06, the subheading all parties agree is most appropriate for core veneer. Ex. 4 to Resp'ts' Br.; Ex. 9 to Pet'rs' Rebuttal Surrogate Data, A-570-970, POI Apr. 1, 2010 – Sept. 30, 2010 (Mar. 21, 2011), Admin. R. Pt. 1 Pub. Doc. 374.  Therefore, the basket category that Commerce opted to use was a basket containing no like product to that being valued.  In other words, by valuing core veneer on the basis of HTS 4408.90.90 drawn from the 2010 NSO data, Commerce valued the core veneer on the basis of exclusively non-core veneer imports to the Philippines.  The unreasonableness of valuing the core veneer in this way is further revealed by the unreasonable outcome that resulted, as discussed below.

Valuing core veneer on the basis of HTS 4408.90.90 results in a surrogate value for core veneer that is higher than the surrogate value for face veneer.[17]  In the Final Determination, Commerce valued Layo's face veneer at 173.41 USD/m3 and Layo's core veneer at 300.08 USD/m3. Layo Final Surrogate Value Sheet, A-570-970, POI Apr. 1, 2010 – Sept. 30, 2010, Admin. R. Pt. 2 Pub. Doc. 23.  Were core veneer more expensive than face veneer, however, there would be no incentive for Layo, or any wood flooring manufacturer, to use core veneer

---

[17] Commerce argues that the court should not consider Layo's argument regarding the relative values of core veneer and face veneer because Layo did not raise this argument before Commerce and, therefore, did not exhaust its administrative remedies. Def.'s Resp. Br. at 14–17.  For a summary of the exhaustion doctrine, see supra note 9.  Commerce's recapitulation of the record appears to be incorrect.  A review of Layo's Case Brief reveals the following passage, which the court believes sufficiently raised the issue to preserve it for appeal:

> [T]he value reflected in the GTA import statistics for HTS 4408.90.9006 is rational because it is lower than the value for "face veneers" under Philippine HTS 4408.90.10 from the NSO data at USD 173.41/M3 as the Department found and as indicated in the above table. In contrast, the value offered by petitioners after the preliminary determination is *higher* than the value determined by the Department for face veneers.  Thus, not only is the basis for petitioners' recommended surrogate value for core veneer less specific but it also defies the economics of MLWF manufacturing and costs.  The core sheets are used as the primary cheap filler wood whereas face veneer is used precisely because it is more expensive.

Layo Case Br. at 19.

materials or invest labor costs in constructing a plywood core
layer from core veneer – a process Layo reported performing and
Commerce verified. Layo Supplemental Section D Questionnaire,
A-570-970, POI Apr. 1, 2010 – Sept. 30, 2010 (Apr. 8, 2011),
Admin. R. Pt. 1 Pub. Doc. 404 at 5; Layo Verification Report
at 13-15.  It follows that Commerce's decision to value core
veneer at a price higher than face veneer, when both the record
and common sense dictate that core veneers are less valuable
than face veneers, is unreasonable.  Therefore, this
determination is remanded to Commerce for reconsideration.

     *B.   Surrogate Value of Layo's HDF Input*

     Fiberboard is available in a range of densities
measured in kilograms per meter cubed ("kg/m3").  These
densities can be grouped into categories such as medium density
fiberboard ("MDF") and high density fiberboard ("HDF").  The
Philippine NSO defines fiberboard ranging in density from 500-
800 kg/m3 as MDF, HTS 4411.21, and fiberboard with a density
above 800 kg/m3 as HDF, HTS 4411.11. I & D Mem., cmt. 20 at 82.

     Layo reported using fiberboard that ranged in density
from 760 kg/m3 to 880 kg/m3,[18] but did not report quantities of

---

[18] Commerce incorrectly identifies the range of densities as
760 kg/m3 to 990 kg/m3 in its Response Brief. Def.'s Resp. Br.
at 18.

each density. Id.  Therefore, Commerce used a simple average of the two HTS categories, HTS 4411.11 and HTS 4411.21, to determine the value of Layo's fiberboard input. Id.  Layo now argues that Commerce should have either used only HTS 4411.11, because Layo reported 820 kg/m3 as the most common density it used, or, if averaging, Commerce should not have converted the values for both HTS categories from USD/kg to USD/m3 using the same measure of density, 820 kg/m3. Resp'ts' Br. at 60-61.

Layo's contention that Commerce should have used only HTS 4411.11 is not persuasive.  Layo argues that "most of the fiberboard [Layo] consumed had a density of 820kg/m3." Id. at 60.  Layo further contends that Commerce agrees with this assertion based on its use of 820 kg/m3 in calculating the surrogate value for the Final Determination. Id. at 60; see also Layo Final Surrogate Value Sheet (employing 820 kg/m3 as a conversion factor for the HDF surrogate value).  But Layo's contentions are not supported by the record.  Layo reported that it consumed fiberboard in densities ranging from 760 kg/m3 to 880 kg/m3, but nothing in the record indicates that Layo reported quantities or percentages of particular densities. See I & D Mem., cmt. 20 at 82; Layo Case Br. at 27.  The simple average of Layo's reported range of densities is 820 kg/m3; however, because this is a simple average and not a weighted average, it does not indicate that 820 kg/m3 was the most common

density consumed by Layo.  Thus, there is no record evidence to support Layo's contention that 820 kg/m3 is the most common density of fiberboard it consumes.  Furthermore, even if Layo predominately consumed fiberboard of a density that fell within HTS 4411.11, it is reasonable for Commerce to account for the other fiberboard Layo consumes, which falls within HTS 4411.21.

Layo's second argument regarding the conversion factor, however, warrants further explanation or reconsideration by Commerce.  Commerce used a two-step calculation to derive the surrogate value for fiberboard.  In step one, Commerce averaged the values of HTS 4411.11 and HTS 4411.21.  In step two, the average value was converted from USD/kg (as reported in the NSO) to USD/m3 (as reported by Layo).  The parties' dispute centers on the proper order of these steps.

In the Final Determination, Commerce averaged the HTS values first, arriving at an average value of 0.54 USD/kg. See Layo Final Surrogate Value Sheet.  Commerce then multiplied the average value by the average density of Layo's fiberboard, 820 kg/m3, to arrive at a surrogate value of 442.90 USD/m3. See Id. Layo contends that Commerce should have first converted each HTS category into USD/m3, by multiplying the value by an appropriate average density, and then averaged the resultant values.  According to Layo, converting each HTS category to USD/m3 would be more accurate because HTS 4411.21, which covers 500-800

kg/m3, would be converted using a density appropriate to that category rather than the average density for Layo's input, 820 kg/m3, which would otherwise fall into HTS 4411.11. Resp'ts' Br. at 61.

Commerce is afforded wide discretion in its selection and calculation of surrogate values. Grobest & I-Mei Indus. (Viet.) Co. v. United States, __ CIT __, 815 F. Supp. 2d 1342, 1351 (2012).  "[The] court's duty is not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." Id. (quoting Zhejiang DunAn, 652 F.3d at 1341 (alteration in original) (internal quotation marks omitted).  Nonetheless, agency action that is unsupported by a reasoned explanation will not be affirmed. See SEC v. Chenery Corp., 332 U.S. 194, 196 (1947) ("[A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency.  If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis.").

Commerce has not provided any explanation for its decision to convert the average HTS value by the average density of Layo's fiberboard input.  While the court will not substitute

its judgment for that of the agency, Layo has raised legitimate

questions about the propriety of Commerce's calculation.  If

Commerce had chosen to perform the calculation differently, it

would likely have changed the surrogate value for HDF.  Without

an explanation of its decision, the court cannot affirm

Commerce's determination. See Id.  Therefore, the surrogate

value for Layo's fiberboard is remanded for further explanation

or reconsideration.

   C.   Brokerage and Handling Fees

        When calculating the export price, Commerce deducts

"the amount, if any, included in such price, attributable to any

additional costs, charges, or expenses . . . which are incident

to bringing the subject merchandise from the original place of

shipment in the exporting country to the place of delivery in

the United States," such as brokerage and handling fees.

19 U.S.C. § 1677a(c)(2)(A).  In this case, Commerce valued

brokerage and handling fees using data for the Philippines from

the World Bank report Doing Business 2011: Making a Difference

for Entrepreneurs ("Doing Business Report"). Preliminary

Surrogate Value Mem. at 17; Doing Business Report, Ex. 9 to

Preliminary Surrogate Value Mem.

        Layo contends that the brokerage and handling fees

reflected in the Doing Business Report are overstated because

they include fees for obtaining a letter of credit, which is not

a component of Layo's costs. Resp'ts' Br. at 81-82.  Commerce

contends that there is no indication that letter of credit costs

are included in the Doing Business Report and, if they are, such

costs are generally paid by the purchaser not the exporter. I &

D Mem., cmt. 8 at 48.

        The record evidence does not support Commerce's

determination.  The World Bank uses data from its Trading Across

Borders Survey to compile the Doing Business Report. See Trading

Across Borders Survey, Ex. 11 to Layo Surrogate Data, A-570-970,

POI Apr. 1, 2010 - Sept. 30, 2010 (Mar. 15, 2011), Admin. R. Pt.

1 Pub. Doc. 364.[19]  Layo points out that the survey asks

respondents to "assume that the method of payment will be a

Letter of Credit . . . ," Trading Across Borders Survey at 3,

and provides respondents an opportunity to detail the costs

associated with an "Export Letter of Credit," Trading Across

Borders Survey at 5.  Commerce responds that the Doing Business

Report contains a list of documents required for export that

does not include a letter of credit, thereby indicating that

_____

        [19] The Trading Across Borders Survey establishes a
hypothetical import/export scenario between the survey
respondent and a fictional company located in a foreign market.
The survey establishes certain parameters for the hypothetical,
including shipping method and value of goods, and asks the
survey respondent to describe the process for importing and
exporting the hypothetical goods into and out of his or her
country. Trading Across Borders Survey at 3.

letters of credit are not included in the World Bank's
calculations. I & D Mem., cmt. 8 at 48; Doing Business Report
at 11.

Commerce's argument is unpersuasive. The Trading
Across Borders Survey not only contemplates the possibility of
exporters using a letter of credit, it directs the respondent to
assume use of a letter of credit, which indicates that letter of
credit expenses are included as a cost of doing business.
Moreover, in a website discussing the methodology of the Trading
Across Borders Survey and Doing Business Report, the World Bank
states that "[p]ayment is made by letter of credit, and the
time, cost and documents required for the issuance or advising
of a letter of credit are taken into account." Trading Across
Borders Methodology, Ex. 12 to Layo Surrogate Data. Nor is the
absence of a letter of credit on the list of necessary export
documents particularly informative. First, a letter of credit
may not be a *necessary* document for exporting, but it is assumed
as part of the exercise. Furthermore, the absence of a letter
of credit from this list does not negate the fact that survey
respondents are told to assume the use of a letter of credit in
constructing their survey response and asked for information
related to acquiring a letter of credit. It is unreasonable to
assume the non-existence in the report of that which the
report's authors expect the survey respondents to assume.

Nor is Commerce's argument that letter of credit expenses are born by the purchaser persuasive.  Commerce asserts this proposition with no record evidence to support it. See I & D Mem., cmt. 8 at 48.  Layo, in contrast, placed on the record a printout of a page from the CreditManagementWorld.com website pertaining to letter of credit fees, which states that some letter of credit fees are borne by the seller and lists the relevant fees. Export Letter of Credit Fees, Ex. 14 to Layo Surrogate Data.  The court does not decide what, if any, weight to give to this evidence, but, at a minimum, Commerce has failed to consider record evidence that detracts from its determination. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight.").[20]

---

[20] A recent case, Since Hardware (Guangzhou) Co. v. United States, __ CIT __, 911 F. Supp. 2d 1362 (2013), affirmed Commerce's refusal to deduct letter of credit expenses from brokerage and handling fees valued using Indian data from the World Bank Doing Business Report.  But the Since Hardware court was presented with a very different record than that at issue here.  Specifically, the Since Hardware court concluded that "without knowing the exact breakdown of the data included in the World Bank Report, [Commerce] can no more deduct a letter of credit expense than add extra expenses which [plaintiff] incurred but are not reflected by the World Bank data." Id. at 1378 (quoting Remand Results at 19-20) (first alteration in original).  Although the Since Hardware court also

(footnote continued)

For the foregoing reasons, Commerce's refusal to adjust the brokerage and handling fees to account for letter of credit fees is not supported by a reasonable reading of the record.  Therefore, the determination is remanded to Commerce for further explanation or reconsideration.

 D.   *Surrogate Financial Ratios*

Respondents also challenge Commerce's calculation of surrogate financial ratios.  In particular, Respondents argue that Commerce improperly rejected, as untimely filed, certain of Respondents' surrogate financial statements and, alternatively, that Commerce did not use the best available information when it declined to factor 2009 financial statements on the record into the surrogate financial ratio calculations.

Commerce has established deadlines for submission of factual information during an investigation.  Pursuant to

---

noted that "[l]etters of credit are not included in the eight listed expenses for document preparation," it did not draw any explicit conclusion from this fact. Id.  As discussed above, the record in the case at issue here does not support a finding that the list of documents for export settles the matter of whether letter of credit expenses are part of the World Bank report's brokerage and handling expenses.  In addition, Commerce made no claim in this case regarding its inability to determine an amount for letter of credit expenses to deduct from the brokerage and handling expenses, as it did in Since Hardware.  For these reasons, Since Hardware is distinguishable, and it is appropriate, on the facts of this case, to remand this issue to Commerce for further explanation consistent with the foregoing discussion.

19 C.F.R. § 351.301(c)(3)(i) (2010), interested parties have

forty days after the publication of the preliminary

determination to submit surrogate value information.  Any

interested party may offer factual information to "rebut,

clarify, or correct" another interested party's factual

submission within a minimum of ten days following an initial

submission of factual information. § 351.301(c)(1).[21]  Commerce

has interpreted § 351.301(c)(1) to exclude the submission of new

surrogate value information in rebuttal. I & D Mem., cmt. 3 at

23-24.  On this basis, Commerce rejected new surrogate financial

statements submitted by Respondents outside of the forty day

window for surrogate data submissions but within the period

permitted for rebuttals. Id. at 23-25.

---

[21] Section 351.301(c)(1) reads in full:

Any interested party may submit factual information to
rebut, clarify, or correct factual information
submitted by any other interested party at any time
prior to the deadline provided in this section for
submission of such factual information.  If factual
information is submitted less than 10 days before, on,
or after (normally only with the Department's
permission) the applicable deadline for submission of
such factual information, an interested party may
submit factual information to rebut, clarify, or
correct the factual information no later than 10 days
after the date such factual information is served on
the interested party or, if appropriate, made
available under APO to the authorized applicant.

The court defers to an agency's interpretation of its own regulation unless that interpretation is "plainly erroneous or inconsistent with the regulation." Amanda Foods (Viet.) Ltd. v. United States, __ CIT __, 807 F. Supp. 2d 1332, 1342 (2011) (quoting Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994)).  This deference "is broader than deference to the agency's construction of a statute, because in the latter case the agency is addressing Congress's intentions, while in the former it is addressing its own." Cathedral Candle Co. v. United States Int'l Trade Comm'n, 400 F.3d 1352, 1363-64 (Fed. Cir. 2005).  Furthermore, the court owes Commerce deference in crafting and executing the procedures necessary to evaluate the record. See PSC VSMPO-Avisma Corp. v. United States, 688 F.3d 751, 760 (Fed. Cir. 2012) ("[A]bsent [constitutional] constraints or [extremely compelling] circumstances, courts will defer to the judgment of an agency regarding the development of the agency record.").  As the Court of Appeals has made clear, it is not this court's role to "intrude[] upon Commerce's power to apply its own procedures for the timely resolution of antidumping [proceedings].  The role of judicial review is limited to determining whether the record is adequate to support the administrative action." Id. at 761.

Respondents contend that Commerce's interpretation of § 351.301(c)(1) is plainly erroneous and inconsistent with the

regulation because (1) the regulation does not prohibit the submission of new factual information or surrogate values and (2) prohibiting submission of new surrogate values in rebuttal denies parties a meaningful right to respond, as contemplated by the regulation.[22] Resp'ts' Br.

Respondent's textual argument is not persuasive. Respondents contend that "[n]owhere in Section 351.301(c)(1) does it limit what type of 'factual information' can be submitted to 'rebut, clarify, or correct.'" Resp'ts' Br. at 74. Respondents are only partially correct.  Section 351.301(c)(1) does not permit the submission of *any* new factual information; rather, it limits the submission to "factual information *to* rebut, clarify, or correct." § 351.301(c)(1) (emphasis added). Thus, the type of factual information permitted under

---

[22] Respondents also argue that Commerce's interpretation of § 351.301(c)(1) disadvantages NME respondents in comparison to market economy respondents. Resp'ts' Br. at 75-77.  Respondents' argument conflates two different procedures in two different types of proceedings without a clear justification. Furthermore, Commerce has discretion to order its market economy proceedings and NME proceedings differently, as they require different types of procedures. See Rhone-Poulenc, Inc. v. United States, 20 CIT 573, 586-87, 927 F. Supp. 451, 462-63 (1996) ("Commerce's Antidumping Manual expressly provides for NME-related investigation methods distinct from those applicable in market economies.  The treatment of exports from market economies has no bearing here, whether contained in the [Antidumping Manual] or in a prior Federal Register Notice given contrary statutory language.") (citations omitted).

§ 351.301(c)(1) is limited to information that rebuts, clarifies, or corrects previously submitted factual information. This is not an unambiguous construction, but such ambiguity is for Commerce to interpret in the first instance. See Cathedral Candle Co., 400 F.3d at 1363 ("The gap between the text of the regulation and the Commission's interpretation of section 777 is filled by the Commission's interpretation of the regulation.").

Commerce has interpreted "factual information to rebut, clarify, or correct" to exclude new surrogate value data. Nothing in this interpretation is erroneous or inconsistent with the regulation itself.  The regulation for rebuttal, clarification, or correction of factual information is part of a larger regulatory section setting forth time limits for submission of factual information.  Interpreting "factual information to rebut, clarify, or correct" to be limited by comparison to the other provisions of § 351.301 is consistent with the creation of a distinct subsection for this purpose. Commerce's interpretation is also consistent with the purpose of the subsection, which is to respond to factual information that has been placed on the record, not to expand the scope of the record.  Finally, interpreting § 351.301(c)(1) to exclude new surrogate value data prevents Commerce from facing a scenario in which either a party has no opportunity to rebut, clarify, or correct new surrogate values submitted in a rebuttal, or

Commerce must accede to rolling rebuttals while also complying with the statutory deadlines for completing investigations and reviews.

Nor is Respondents' second argument, concerning the meaningful right to respond, persuasive.  The following facts are relevant to this aspect of Respondents' argument: Prior to the Preliminary Determination, Petitioners argued that Indonesia should be the surrogate country and submitted surrogate value data for Indonesia. I & D Mem., cmt. 3 at 25.  In the Preliminary Determination, Commerce chose the Philippines as the surrogate country. Id.  Petitioners submitted their post-preliminary surrogate values on the last day of the period for submissions, pursuant to § 351.301(c)(3)(i), but instead of submitting data on Indonesian surrogate values Petitioners changed course and submitted surrogate value data for the Philippines, which included 2010 financial statements for Philippine plywood producers. Pet'rs' Factor Data at 16–22. Respondents offered alternative 2010 financial statements of Philippine plywood producers in rebuttal, but these statements were rejected by Commerce. I & D Mem., cmt. 3 at 22–23. Respondents now argue that they were prejudiced by having no opportunity to submit new surrogate value data for the Philippines in response to the surrogate value data submitted by Petitioners.

But Respondents' argument misconstrues the nature of the proceeding.  Respondents were aware that Commerce selected the Philippines as the primary surrogate country in the Preliminary Determination and were on notice that Petitioners might choose to submit surrogate value data for the Philippines. Respondents had access to the surrogate value data later rejected by Commerce and an opportunity to put that data on the record during the forty day window for submission of new surrogate value data, pursuant to § 351.301(c)(3)(i). Furthermore, Respondents were aware that Commerce uses contemporaneity as one of the factors in considering which surrogate value data to use, see supra note 7, and that the 2009 financial statements on the record prior to the Preliminary Determination were not contemporaneous with the POI.  Finally, Commerce explicitly notified parties that it does not consider new surrogate value data on rebuttal. See I & D Mem., cmt. 3 at 24.  Thus, Respondents had all the notice and opportunity they needed to put the rejected financial statements on the record in the forty day window provided, pursuant to § 351.301(c)(3)(i), and they chose not to do so.  The right to "rebut, clarify, and correct" is not a substitute for a party's obligation to develop

the record in a timely manner, nor were Respondents prejudiced

on the facts of this case.[23]

      Finally, Respondents argue that Commerce abused its

discretion by not factoring the 2009 financial statements on the

record into its surrogate financial ratio determination.

Resp'ts' Br. at 78-81.  Commerce determined that the 2010

financial statements submitted by Petitioners were the best

available information because they were contemporaneous with the

POI and that the 2009 financial statements should be rejected as

non-contemporaneous. I & D Mem., cmt. 1 at 12.  Commerce has

provided a reasoned explanation for its determination, and the

court will not substitute its judgment for that of the agency.

Zhejiang DunAn, 652 F.3d at 1341.

      For these reasons, Commerce's rejection of

Respondents' late filed surrogate financial statements is

affirmed.

---

    [23] In their briefing, Respondents raise a scenario in which
a party submits new surrogate value data on the fortieth day of
the § 351.301(c)(3)(i) period relating to a surrogate country
that no party argued for prior to the preliminary determination
and which Commerce did not choose in the preliminary
determination. Resp'ts' Reply Br. at 23-25.  Certainly,
Commerce's refusal to accept alternative surrogate values in
such a scenario would be reviewed for abuse of discretion. See
Wuhu Fenglian Co. v. United States, __ CIT __, 836 F. Supp. 2d
1398, 1403 (2012).  The court also acknowledges, without
deciding, that on the stated facts an opposing party may be
prejudiced.  But, those are not the facts of this case.

**CONCLUSION**

        In light of the foregoing: (1) the court grants
Commerce's request for remand to reconsider the surrogate value
determinations for Layo's plywood input and Samling's HDF input;
(2) the court grants Commerce's request for remand of the
targeted dumping determination for reconsideration in light of
any changes to the surrogate value determinations and in light
of Commerce's current standards for applying the targeted
dumping method; (3) the court remands the surrogate value
determinations for Layo's core veneer input, Layo's HDF input,
and the brokerage and handling fees for further explanation or
reconsideration consistent with this opinion; and (4) the court
affirms Commerce's rejection of Respondents' late filed
surrogate financial statements.

        Commerce shall have until September 30, 2013, to
complete and file its remand redetermination.  Plaintiffs and
Defendant-Intervenors shall have until October 15, 2013, to file
comments.  Plaintiffs, Defendant, and Defendant-Intervenors
shall have until October 29, 2013, to file any reply.

        **IT IS SO ORDERED.**


                                    _____/s/ Donald C. Pogue____
                                    Donald C. Pogue, Chief Judge


Dated: July 31, 2013
       New York, NY